JEAN E. WILLIAMS
Deputy Assistant Attorney General
Environment and Natural Resources Division
United States Department of Justice
MICHAEL S. SAWYER (CSB No. 277766)
MICHELLE-ANN C. WILLIAMS (MD Bar)
Trial Attorneys, Natural Resources Section
H. HUBERT YANG (DC Bar No. 491308)
Senior Trial Attorney, Wildlife & Marine Resources Section
150 M Street NE
Washington, D.C. 20002
Tel: (202) 514-5273, (202)-305-0420
Fax: (202) 305-0506
michael.sawyer@usdoj.gov
michelle-ann.williams@usdoj.gov

*Counsel for Defendants Scott Angelle, Bureau of
Safety and Environmental Enforcement, David
Bernhardt, and the Department of the Interior*

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF CALIFORNIA

|  |  |
|---|---|
| SIERRA CLUB, et al.,<br><br>        Plaintiffs,<br><br>    vs.<br><br>SCOTT ANGELLE, et al.,<br><br>        Defendants. | Case No. 3:19-cv-03263-RS<br><br>**DEFENDANTS' MOTION TO TRANSFER TO THE EASTERN DISTRICT OF LOUISIANA, OR IN THE ALTERNATIVE, TO THE DISTRICT OF COLUMBIA**<br><br>Date: November 21, 2019<br>Time: 1:30 p.m.<br>Judge: Richard Seeborg<br><br>Courtroom 3, 17th Floor<br>450 Golden Gate Avenue<br>San Francisco, CA 94102 |

# TABLE OF CONTENTS

NOTICE OF MOTION AND MOTION TO TRANSFER ............................................................ 1

MEMORANDUM OF POINTS AND AUTHORITIES ............................................................ 1

   I.      INTRODUCTION ................................................................................................. 1

   II.     BACKGROUND ................................................................................................. 2

      A.  The Vast Majority of OCS Drilling Occurs in the Gulf of Mexico. ............................ 2

      B.  The Challenged Rule Was Drafted in Louisiana and the District of Columbia............ 4

      C.  Plaintiffs Reside in Louisiana and the District of Columbia. ....................................... 4

      D.  Plaintiffs' Suit Focuses on OCS Activities in the Gulf of Mexico. ............................. 5

      E.  This District Presently Has No Interest in this Litigation. ........................................... 7

   III.    ARGUMENT ................................................................................................. 8

      A.  This Action Could Have Been Brought in the Eastern District of Louisiana or the District of Columbia. ................................................................................. 9

      B.  The Section 1404(a) Factors Support Transferring This Action to the Eastern District of Louisiana. ................................................................................. 10

         1.  Plaintiffs' Choice of Forum is Entitled to Minimal Deference............................. 10

         2.  The Local Interest in the Controversy Supports Transfer to the Eastern District of Louisiana. ............................................................................ 15

         3.  The Remaining Factors Either Favor Transfer to the Eastern District of Louisiana or Are Neutral. ............................................................................ 18

      C.  Alternatively, the Section 1404(a) Factors Support Transferring This Action to the District of Columbia. ................................................................................. 22

         1.  The Local Interest in the Controversy Favors Transfer to the District of Columbia. 22

         2.  The Convenience Factors Also Support Transfer to the District of Columbia..... 23

         3.  The Administrative Factors Favor Transfer to the District of Columbia or are Neutral................................................................................. 24

CONCLUSION................................................................................. 25

## <u>TABLE OF AUTHORITIES</u>

**Cases**

*Alec L. v. Jackson*,
    No. C-11-2203 EMC, 2011 WL 8583134 (N.D. Cal. Dec. 6, 2011) ............................... *passim*

*Allstar Mktg. Grp., LLC v. Your Store Online, LLC.*,
    666 F. Supp. 2d 1109 (C.D. Cal. 2009) ................................................................. 20

*Animal Legal Def. Fund v. U.S. Dep't of Agric.*,
    No. CV 12-4407-SC, 2013 WL 120185 (N.D. Cal. Jan. 8, 2013) ........................................ 20

*Bay.org v. Zinke*,
    No. 17-CV-03739-YGR, 2017 WL 3727467 (N.D. Cal. Aug. 30, 2017) ............................... 15

*Chesapeake Climate Action Network v. Exp.-Imp. Bank of the U.S.*,
    No. C 13-03532 WHA, 2013 WL 6057824 (N.D. Cal. Nov. 15, 2013) ........................... *passim*

*Clapper v. Amnesty Int'l USA*,
    568 U.S. 398 (2013) ........................................................................................... 13

*Commodity Futures Trading Comm'n v. Savage*,
    611 F.2d 270 (9th Cir. 1979) .................................................................................. 9

*Cont'l Grain Co. v. Barge FBL-585*,
    364 U.S. 19 (1960) ............................................................................................... 8

*Costco Wholesale Corp. v. Liberty Mut. Ins. Co.*,
    472 F. Supp. 2d 1183 (S.D. Cal. 2007) ............................................................. 20, 21

*Ctr. for Biological Diversity v. Kempthorne*,
    No. C 07 0894 EDL, 2007 WL 2023515 (N.D. Cal. July 12, 2007) ............................... *passim*

*Ctr. for Biological Diversity v. Rural Utils. Serv.*,
    No. C-08-1240 MMC, 2008 WL 2622868 (N.D. Cal. June 27, 2008) ............................. 11, 18

*Ctr. for Food Safety v. Vilsack*,
    No. C 11-00831 JSW, 2011 WL 996343 (N.D. Cal. Mar. 17, 2011) .................... 11, 16, 20, 22

*Da Cruz v. Princess Cruise Lines, Inc.*,
    No. C-00-0867 TEH, 2000 WL 1585695 (N.D. Cal. Oct. 12, 2000) ...................... 13

*Fabus Corp. v. Asiana Express Corp.*,
    No. C-00-3172 PJH, 2001 WL 253185 (N.D. Cal. Mar. 5, 2001) ........................... 10

*Gerin  v. Aegon USA, Inc.*,
    No. 06-5407, 2007 WL 1033472 (N.D. Cal. Apr. 4, 2007) .................................... 17

*Gulf Oil Corp. v. Gilbert*,
    330 U.S. 501 (1947) ..................................................................................... 15, 16

*Hatch v. Reliance Ins. Co.*,
    758 F.2d 409 (9th Cir. 1985) ................................................................................. 9

*Heredia v. Sunrise Senior Living LLC*,
    No. 18-cv-00616-HSG, 2018 WL 5734617 (N.D. Cal. Oct. 31, 2018)...................................14

*Holliday v. Lifestyle Lift, Inc.*,
    No. C 09-4995 RS, 2010 WL 3910143 (N.D. Cal. Oct. 5, 2010)............................................10

*Inherent.com v. Martindale-Hubbell*,
    420 F. Supp. 2d 1093 (N.D. Cal. 2006) ...................................................................................8

*Jones v. GNC Franchising, Inc.*,
    211 F.3d 495 (9th Cir. 2000) ..............................................................................................9, 10

*Knapp v. Wachovia Corp., No. C*,
    07-4551 SI, 2008 WL 2037611 (N.D. Cal. May 12, 2008) ....................................................11

*Koster v. (Am.) Lumbermens Mut. Cas. Co.*,
    330 U.S. 518 (1947)..........................................................................................................12, 13

*Ly-Luck Rest. v. U.S. Dep't of Labor*,
    No. C-92-3852 SBA, 1993 WL 121780 (N.D. Cal. Apr. 1, 1993) .........................................13

*Mater of Stokes*,
    No. 16-14645, 2016 WL 7012301 (E.D. La. Dec. 1, 2016) ...................................................21

*Nat. Res. Def. Council v. Gutierrez*,
    No. C 01-0421 JL, 2007 WL 1518359 (N.D. Cal. May 22, 2007) ...........................................5

*Piper Aircraft Co. v. Reyno*,
    454 U.S. 235 (1981)...............................................................................................................10

*Ramirez v. Prof'l Transp., Inc.*,
    No. 16-CV-1340-JPG-RJD, 2017 WL 1836625 (S.D. Ill. May 8, 2017) ...............................21

*S. Utah Wilderness v. Norton*,
    No. Civ.A. 01-2518(CKK), 2002 WL 32617198 (D.D.C. June 28, 2002)..............................15

*Saleh v. Titan Corp.*,
    361 F. Supp. 2d 1152 (S.D. Cal. 2005)..................................................................................19

*Sierra Club v. U.S. Def. Energy Support Ctr.*,
    No. C 10-02673 JSW, 2011 WL 89644 (N.D. Cal. Jan. 11, 2011) ..................................11, 19

*Sierra Club v. U.S. Dep't of State*,
    No. C 09-04086 SI, 2009 WL 3112102 (N.D. Cal. Sept. 23, 2009)...............................*passim*

*United States v. Perea-Rey*,
    680 F.3d 1179 (9th Cir. 2012) .................................................................................................3

*Van Dusen v. Barrack*,
    376 U.S. 612 (1964)..................................................................................................................8

*Whitmore v. Arkansas*,
    495 U.S. 149 (1990)................................................................................................................13

*Williams v. Bowman*,
  157 F. Supp. 2d 1103 (N.D. Cal. 2001) ................................................................. 10

**Statutes**

28 U.S.C. § 1391(c)(2) ..................................................................................... 9, 11

28 U.S.C. § 1391(e)(1) ............................................................................................ 9

28 U.S.C. § 1404(a) ................................................................................................ 8

28 U.S.C. § 1407(a) .............................................................................................. 21

**Regulations**

30 C.F.R. § 250.462 ................................................................................................ 6

30 C.F.R. § 250.462(b) ........................................................................................... 5

30 C.F.R. § 250.724(a) (2018) ............................................................................... 6

30 C.F.R. § 250.724(b), (c) .................................................................................... 6

30 C.F.R. § 250.732(d) (2018) ............................................................................... 6

30 C.F.R. §§ 250.414(c)(2) ..................................................................................... 6

30 C.F.R. §§ 250.734(a) .......................................................................................... 5

**Federal Register**

80 Fed. Reg. 21,504, 21,516 (Apr. 17, 2015) ........................................................ 6

81 Fed. Reg. 25, 888 (April 29, 2016) ................................................................... 4

84 Fed. Reg. 21,908 (May 15, 2019) ..................................................................... 1

**Other Authorities**

15 Fed. Prac. & Proc. Juris. § 3848 ...................................................................... 12

## **TABLE OF ABBREVIATIONS**

| | |
|---|---|
| BOEM | Bureau of Ocean Energy Management |
| BOP | Blowout Preventer |
| BSEE | Bureau of Safety and Environmental Enforcement |
| GOM | Gulf of Mexico |
| GOMR | Gulf of Mexico Region |
| OCS | Outer Continental Shelf |

### TABLE OF EXHIBITS[1]

Ex. A – Final Environmental Assessment (May 2019)

Ex. B – Bureau of Ocean Energy Management, 2019–2024 National OCS Oil and Gas Leasing Draft Proposed Program (January 2018)

Ex. C – BOEM Combined Leasing Report (Sept. 1, 2019)

Ex. D – Complaint, *Nat. Res. Def. Council v. Ross*, No. 19-cv-00431, 2019 WL 926987 (D.D.C. Feb. 21, 2019)

Ex. E – Complaint, *Friends of the Earth v. EPA*, No. 14-cv-00753, 2014 WL 1724211 (D.D.C. Apr. 30, 2014)

Ex. F – North Carolina Coastal Federation, https://www.nccoast.org/ (last accessed October 9, 2019)

Ex. G – Natural Resources Defense Council, Contact Us, https://www.nrdc.org/contact-us (last accessed October 9, 2019)

Ex. H – Amicus Brief, *Winter v. Nat. Res. Def. Council*, No. 07-1239 (U.S.), SR009 ALI-ABA 209

Ex. I – Center for Biological Diversity, Contact Us, https://www.biologicaldiversity.org/about/contact/ (last accessed October 9, 2019).

Ex. J – MDL Statistics Report – Distribution of Pending MDL Dockets by Actions Pending (July 16, 2019)

Ex. K – Statistical Comparison of Non-MDL Cases Pending in the Eastern District of Louisiana and the Northern District of California

Ex. L – List of Cases Brought by Gulf Restoration Network in Eastern District of Louisiana

Ex. M – List of Cases Brought by Sierra Club in Eastern District of Louisiana

Ex. N – List of Cases Brought by Natural Resources Defense Council in Eastern District of Louisiana

Ex. O – List of Cases Brought by Center for Biological Diversity in Eastern District of Louisiana

Ex. P – List of Cases Brought by Defenders of Wildlife in Eastern District of Louisiana

---

[1] All exhibits are attached to the Declaration of Michael S. Sawyer in Support of Defendants' Motion to Transfer submitted herewith.

Ex. Q – List of Cases Brought by Sierra Club in the District of Columbia

Ex. R – List of Cases Brought by Center for Biological Diversity in the District of Columbia

Ex. S – List of Cases Brought by Defenders of Wildlife in the District of Columbia

Ex. T – List of Cases Brought by Natural Resources Defense Council in the District of Columbia

Ex. U – List of Cases Brought by Friends of the Earth in the District of Columbia

Ex. V – List of Cases Brought by Healthy Gulf in the District of Columbia

Ex. W – List of Cases Brought by Gulf Restoration Network in the District of Columbia

Ex. X – List of Cases Brought by South Carolina Coastal Conservation League in the District of Columbia

## NOTICE OF MOTION AND MOTION TO TRANSFER

PLEASE TAKE NOTICE THAT on November 21, 2019, at 1:30 p.m. before the Honorable Richard Seeborg, Courtroom 3, 17th Floor, 450 Golden Gate Avenue, San Francisco, CA 94102, Defendants Scott Angelle, in his official capacity as Director of the Bureau of Safety and Environmental Enforcement (BSEE), BSEE, David Bernhardt, in his official capacity as Secretary of the Interior, and the Department of the Interior, will move the Court for an order transferring this action to the U.S. District Court for the Eastern District of Louisiana, or in the alternative, to the U.S. District Court for the District of Columbia.

This case challenges a Department of Interior rule titled "Oil and Gas and Sulfur Operations in the Outer Continental Shelf–Blowout Preventer Systems and Well Control Revisions," 84 Fed. Reg. 21,908 (May 15, 2019) (Revised Well Control Rule), which promulgated regulations governing oil and gas activities on the Outer Continental Shelf (OCS). That challenge should be heard in the Eastern District of Louisiana, as the vast majority of regulated activities occurs off that district's coast, while no such activities occur off this District's coast.  Alternatively, that challenge should be heard in the District of Columbia, where senior officials deliberated over and ultimately approved the rule.

## MEMORANDUM OF POINTS AND AUTHORITIES

### I.   INTRODUCTION

Plaintiffs, a consortium of eight environmental groups, challenge the Revised Well Control Rule.  Although that rule governs OCS oil and gas activities, Plaintiffs bring suit in a district where no such activities occur.  Indeed, venue is permissible in this District only because one of eight Plaintiffs resides here.  Aside from that single Plaintiff's residence, this District has no interest in this litigation.

The Eastern District of Louisiana, however, has a substantial interest in this litigation. Ninety-eight percent (98%) of the nation's OCS oil and gas production comes from the Gulf of Mexico, giving that region the greatest stake in regulatory changes affecting OCS oil and gas activities.  And the Gulf of Mexico region is the *only* one with any stake in many of the challenged revisions, which concern deepwater drilling equipment that is used only in the Gulf

1   region of the OCS.  Moreover, the challenged Rule was primarily drafted in the Eastern District

2   of Louisiana, and Plaintiff Healthy Gulf resides there.  Thus, the Eastern District of Louisiana

3   has a far stronger interest in this litigation than this District.

4        Alternatively, the case should be transferred to the District of Columbia, where

5   Defendants reside, Plaintiffs reside, and much of the administrative and decision-making

6   processes occurred.

7   **II.  BACKGROUND**

8        **A.  The Vast Majority of OCS Drilling Occurs in the Gulf of Mexico.**

9        "The vast majority of active OCS oil and gas operations take place in the Gulf of

10  Mexico."  Ex. A, Final Environmental Assessment, at 7, May 2019.  The Gulf of Mexico (GOM)

11  produces ninety-eight percent (98%) of the nation's OCS oil and gas.  Ex. B, 2019–2024

12  National OCS Oil and Gas Leasing Draft Proposed Program, at 4-7, January 2018 (Draft

13  Proposed Program).  "The geology of the GOM basin and the complexity and abundance of its

14  salt structures provides the setting that makes the GOM one of the richest oil and natural gas

15  regions in the world."  *Id.*  The prevalence of OCS drilling in the GOM is reflected in the number

16  of active leases in the Gulf, as seen in the map below.[2]



Gulf of Mexico

27

28  ──────────────────────────

[2] These maps come from MarineCadastre.gov, which was developed through a partnership
between the U.S. Department of Commerce's National Oceanic and Atmospheric Administration

1    The Gulf of Mexico OCS has nearly 2,500 active oil and gas leases.  Ex. C, BOEM Combined

2    Leasing Report (Sept. 1, 2019); Am. Compl. ¶ 81, Dkt. No. 20.

3            The Gulf's primacy in OCS oil and gas production is reflected in the distribution of jobs

4    sustained from OCS oil and gas activities, as "approximately 70 percent of jobs remain in the

5    states adjacent to the GOM (i.e., Texas, Louisiana, Alabama, Mississippi, and Florida)," with

6    over 16 percent of those jobs being in Louisiana.  Ex. B, Drafted Proposed Program, at 8-4.

7            Just three other OCS areas, the Beaufort Sea off of Alaska, the Cook Inlet off of Alaska,

8    and Southern California, contain active OCS leases, as seen in the maps below.



|  Beaufort Sea  |  Cook Inlet  |  Southern California  |

15   These regions have, respectively, 40, 14, and 34 leases.  Ex. C; Am. Compl. ¶¶ 77, 80.

16           In contrast, no OCS oil or gas production occurs along this District's coast.  Ex. B, Draft

17   Proposed Program, at 4-7; Ex. C.  Without an active lease, no OCS oil or gas activities governed

18   by the Revised Well Control Rule can occur.

---

Office for Coastal Management and the U.S. Department of the Interior's Bureau of Ocean
Energy Management (BOEM).  They were generated using the National Viewer, which is
available at https://marinecadastre.gov/nationalviewer/.  The maps feature the layer "Active Oil
and Gas Leases," which are reflected in boxes over the water, on top of the Street Basemap.
Pursuant to Federal Rule of Evidence 201, Defendants request that the Court take judicial notice
of the active OCS lease locations in these maps.  *See United States v. Perea-Rey*, 680 F.3d 1179,
1182 n.1 (9th Cir. 2012) (taking judicial notice of "a Google map and satellite image").

**B.  The Challenged Rule Was Drafted in Louisiana and the District of Columbia.**

Following publication of the initial Blowout Preventer Systems and Well Control Rule, 81 Fed. Reg. 25,888 (April 29, 2016) (2016 Well Control Rule), BSEE received numerous questions about how it would implement the new regulations in various situations.  BSEE's Gulf of Mexico Region Office, located in New Orleans, Louisiana, responded to those questions, drafting "approximately 100 responses to questions about the 2016 Well Control Rule." Declaration of Frederick A. Brink IV ¶¶ 1–2 (Brink Decl.).

In light of its experience leading the implementation of the 2016 Well Control Rule, BSEE's Gulf of Mexico Region Office also led the drafting of the proposed and final versions of the Revised Well Control Rule.  *Id.* ¶ 9.

The draft proposed and final rules were then revised by officials based in Washington, D.C.  *Id.*  The final decision to publish the Revised Well Control Rule was made by the Assistant Secretary for Land and Minerals Management of the Department of the Interior, who is located in Washington, D.C.  *Id.*  "The environmental analysis and regulatory impact analysis for the Revised Well Control Rule were also completed in the Washington, D.C. area."  *Id.*

None of the rulemaking process occurred in the Northern District of California.  *Id.* ¶ 10. Indeed, BSEE does not even have an office or other physical presence in this District.  *Id.*

**C.  Plaintiffs Reside in Louisiana and the District of Columbia.**

Like the rulemaking process for the Revised Well Control Rule, Plaintiffs are located in both the Eastern District of Louisiana and the District of Columbia.  Plaintiff Healthy Gulf is headquartered in New Orleans, Louisiana.  Ex. D ¶ 15.  And Plaintiffs Defenders of Wildlife and Friends of the Earth are headquartered in Washington, D.C.  Am. Compl. ¶¶ 23, 24; Ex. E ¶ 6.

1    Indeed, only one of eight Plaintiffs resides in this District.  The remaining Plaintiffs

2  reside in Louisiana, the District of Columbia, North Carolina,[3] South Carolina,[4] New York,[5] and

3  Arizona,[6] according to their own statements.

4    **D.  Plaintiffs' Suit Focuses on OCS Activities in the Gulf of Mexico.**

5    Plaintiffs' lawsuit focuses on OCS activity in the Gulf of Mexico, from events leading up

6  to the *Deepwater Horizon* disaster (Am. Compl. ¶¶ 87–95) to recommendations from panels

7  convened to investigate the causes and effects of that event (*id.* ¶¶ 96–103).  In Plaintiffs' view,

8  BSEE "failed to consider" the cumulative impacts of "damage to the Gulf of Mexico from the

9  *Deepwater Horizon* disaster" and "other oil and gas industry impacts to the region" when

10  analyzing the environmental impact of the Revised Well Control Rule.  *Id.* ¶¶ 177, 179, 182.

11    Plaintiffs further allege that the Revised Well Control Rule ignores lessons learned from

12  the *Deepwater Horizon* spill, *see id.* ¶¶ 6, 150, thereby increasing safety risks "when drilling

13  operations are increasing in new high-pressure, ultra-deepwater environments,"*id.* ¶ 181.  These

14  concerns about ultra-deepwater drilling fixate on the Gulf of Mexico, which is the only location

15  in the nation's jurisdiction where ultra-deepwater drilling occurs.  Brink Decl. ¶ 6.

16    When it comes to their specific criticisms of the Revised Well Control Rule, Plaintiffs

17  identify many revisions that apply only to drilling equipment used in the Gulf of Mexico.  For

18  example, Plaintiffs challenge revisions to regulations governing subsea blowout preventers

19  (BOPs) and BOPs on floating facilities.  Am. Compl. ¶¶ 142–143 (challenging revisions to 30

20  C.F.R. §§ 250.734(a), 250.733(b)(1)).  Subsea BOPs and BOPs on floating facilities on the OCS

21  are used only in the Gulf of Mexico.  Brink Decl. ¶¶ 6–7; Declaration of Bruce H. Hesson ¶ 6.

22    Similarly, Plaintiffs attack revisions to containment equipment requirements.  Am.

23  Compl. ¶ 148 (challenging revision to 30 C.F.R. § 250.462(b)).  Again, those revisions affect

24

25  [3] Ex. F.

26  [4] Am. Compl. ¶ 26.

27  [5] *Nat. Res. Def. Council v. Gutierrez*, No. C 01-0421 JL, 2007 WL 1518359, at *1 (N.D. Cal. May 22, 2007); Ex. G.

28  [6] Ex. H, SR009 ALI-ABA at 219; Ex. I.

1   only OCS activity in the Gulf of Mexico region.  The containment equipment requirements apply

2   only to "drilling operations using a subsea BOP or surface BOP on a floating facility."  2016

3   Well Control Rule, 81 Fed. Reg. at 26,020.  When proposing that Rule, BSEE sought comments

4   on "whether the source control and containment requirements [in 30 C.F.R. § 250.462] should be

5   applicable to wells drilled in shallow water."  Blowout Preventer Systems and Well Control, 80

6   Fed. Reg. 21,504, 21,516 (Apr. 17, 2015).  Although some commenters suggested that the

7   containment equipment requirements should also apply to Arctic OCS drilling operations, which

8   use other types of BOPs, *see* 81 Fed. Reg. at 25,902, BSEE maintained the originally proposed

9   scope of its containment equipment requirement.  30 C.F.R. § 250.462 (2017).  Because subsea

10  BOPs and BOPs on floating facilities on the OCS are located only in the Gulf of Mexico region,

11  Brink Decl. ¶¶ 6–7, BSEE's revisions to its containment equipment requirements apply only to

12  those drilling operations in the Gulf of Mexico that use such equipment.

13          Plaintiffs also challenge changes to real-time monitoring standards and Mechanical

14  Integrity Assessment Reports.  Am. Compl. ¶ 140 (challenging revision to 30 C.F.R.

15  § 250.724(b), (c)); *id.* ¶ 144 (challenging revisions to 30 C.F.R. § 250.732(d)).  But those

16  changes apply only to operations involving a subsea BOP, a surface BOP on a floating facility,

17  or a high pressure high temperature (HPHT) environment.  30 C.F.R. § 250.724(a) (2018); 30

18  C.F.R. § 250.732(d) (2018).  As previously mentioned, subsea BOPs and surface BOPs on

19  floating facilities on the OCS are used only in the Gulf of Mexico.  Because there are also no

20  HPHT environments in active leases on the Pacific OCS, Declaration of Bruce H. Hesson ¶ 5,

21  the Gulf of Mexico also has a much greater interest in these changes.

22          Finally, Plaintiffs challenge the incorporation of API Bulletin 92L, Drilling Ahead Safely

23  with Lost Circulation in the Gulf of Mexico, into the Revised Well Control Rule.  Am. Compl.

24  ¶¶ 141, 226 (challenging revisions to 30 C.F.R. §§ 250.414(c)(2), 250.427(b)).  As the 2016 Well

25  Control Rule noted, the distinctive geology of the Gulf of Mexico Region (GOMR) counseled in

26  favor of "increased planning flexibility when drilling into areas that could require lower safe

27  drilling margins, such as depleted sands or below salt (both common occurrences in

28

the GOMR),” and it was “BSEE GOMR practice to allow alternative drilling margins when justified and documented.”  81 Fed. Reg. at 25,895.  At that time, BSEE also noted that it “would evaluate API Bulletin 92L” for incorporation in a future rulemaking.  *Id.* at 25,921.  In the Revised Well Control Rule, BSEE incorporated the drilling practices in API Bulletin 92L— which “was developed, with BSEE’s input, based on experiences with deepwater drilling in the Gulf of Mexico” and describes drilling practices “tailored to the geology of that region.”  Brink Decl. ¶ 8.

### E.  This District Presently Has No Interest in this Litigation.

Given their thin connection to this District and the absence of OCS oil or gas leases along this District’s coast, Plaintiffs seek to manufacture a local interest in this litigation based on a *draft* proposal for potential future lease sales.  *See* Am. Compl. ¶ 84.  But that draft proposal is not a fait accompli; it “is the first in a series of three preliminary proposals made by the Secretary [of the Interior] consistent with the OCS Lands Act, before he may take final action.”  Ex. B, Draft Proposed Program, at 3.  As seen in the figure below, there are a significant number of



Figure 1-6:  National OCS Oil and Gas Leasing Program and Development Process

1  decision-making points (*e.g.*, comment and revision opportunities, environmental analyses,

2  government-to-government consultations) that must occur before any new leasing areas might

3  implicate the Revised Well Control Rule. *Id.* at 1-12 (the star indicates the draft proposal's

4  progress to date; the red box was added to the figure above to indicate when the Revised Well

5  Control Rule is first implicated).

6       Moreover, the draft proposal anticipates narrowing the areas subject to leasing, as the

7  Secretary moves toward final action.  The draft proposal includes "at this stage nearly the entire

8  OCS," *id.* at 1, in order to provide "maximum flexibility so that areas considered for leasing may

9  be narrowed at later stages . . . after further environmental analysis and important input and

10  coordination with key stakeholders," *id.* at 2.  Given this narrowing potential and the significant

11  time that will pass before any drilling could even hypothetically occur off this District's coast,

12  this District has no present interest in the Revised Well Control Rule.  *See id.* at 1 ("Production

13  from exploration and development in newly available OCS areas will likely not occur for a

14  decade or more . . . .").

15  **III.** **ARGUMENT**

16       The Court has authority to transfer this case pursuant to 28 U.S.C. § 1404(a), which

17  provides that:

18       For the convenience of parties and witnesses, in the interest of justice, a district
     court may transfer any civil action to any other district or division where it might

19       have been brought.

20  *Id.*  "The idea behind § 1404(a) is that where a 'civil action' to vindicate a wrong—however

21  brought in a court—presents issues . . . that make one District Court more convenient than

22  another, the trial judge can, after findings, transfer the whole action to the more convenient

23  court." *Cont'l Grain Co. v. Barge FBL-585*, 364 U.S. 19, 26 (1960).  The statute's purpose is to

24  "prevent the waste of time, energy, and money and to protect litigants, witnesses and the public

25  against unnecessary inconvenience and expense." *Van Dusen v. Barrack*, 376 U.S. 612, 616

26  (1964) (internal citations and quotation marks omitted).  This Court has broad discretion under

27  Section 1404(a) to transfer claims to another judicial district. *Inherent.com v. Martindale-

28  Hubbell*, 420 F. Supp. 2d 1093, 1098 (N.D. Cal. 2006).

1    Courts employ a two-step analysis when determining whether to transfer an action

2    pursuant to Section 1404(a).  First, a court considers whether the action could have been brought

3    in the district to which the transfer is sought.  *Hatch v. Reliance Ins. Co.*, 758 F.2d 409, 414 (9th

4    Cir. 1985).  Second, a court undertakes "an individualized, case-by-case consideration of

5    convenience and fairness[,]" taking into account the convenience of the parties and the interests

6    of justice.  *Jones v. GNC Franchising, Inc.*, 211 F.3d 495, 498 (9th Cir. 2000) (citation omitted).

7    While the burden is on the moving party to demonstrate that the action should be transferred,

8    *Commodity Futures Trading Comm'n v. Savage*, 611 F.2d 270, 279 (9th Cir. 1979), this burden

9    decreases "[a]s deference to a plaintiff's choice of forum decreases," *Chesapeake Climate Action*

10   *Network v. Exp.-Imp. Bank of the U.S.*, No. C 13-03532 WHA, 2013 WL 6057824, at *2 (N.D.

11   Cal. Nov. 15, 2013).

**A.  This Action Could Have Been Brought in the Eastern District of Louisiana or the District of Columbia.**

14   Here, the first factor is satisfied because this action could have been brought in the

15   Eastern District of Louisiana or the District of Columbia.  Under 28 U.S.C. § 1391(e)(1), which

16   governs venue in civil actions where the United States or any of its officers or agencies is a

17   defendant, venue lies in any judicial district in which "(A) a defendant in the action resides, (B) a

18   substantial part of the events or omissions giving rise to the claim occurred . . . or (C) the

19   plaintiff resides . . . ."  *Id.*  Here, venue is appropriate in both the Eastern District of Louisiana

20   and the District of Columbia under subsection (B) of Section 1391(e)(1) because the challenged

21   rule was drafted and revised in those districts.  *See supra* Part II.B.  Venue is also appropriate in

22   both districts under subsection (C) because Plaintiff Healthy Gulf resides in the Eastern District

23   of Louisiana and Plaintiffs Friends of the Earth and Defenders of Wildlife reside in the District

24   of Columbia.  *See supra* Part II.E; *see also* 28 U.S.C. § 1391(c)(2) ("an entity with the capacity

25   to sue and be sued in its common name under applicable law, whether or not incorporated, shall

26   be deemed to reside, . . . if a plaintiff, only in the judicial district in which it maintains its

27   principal place of business").  Because venue properly lies in the forums to which transfer is

28   sought, this requirement is satisfied.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**B.  The Section 1404(a) Factors Support Transferring This Action to the Eastern District of Louisiana.**

In deciding whether to transfer, the Court "considers public factors which go to the interests of justice, and private factors, which speak to the convenience of the parties and witnesses." *Holliday v. Lifestyle Lift, Inc.*, No. C 09-4995 RS, 2010 WL 3910143, at *5 (N.D. Cal. Oct. 5, 2010) (citing *Jones*, 211 F.3d at 498).  These factors include the following:

> (1) plaintiff's choice of forum; (2) convenience to the parties; (3) convenience to witnesses; (4) ease of access to the evidence; (5) familiarity of each forum with the applicable law; (6) feasibility of consolidation with other claims; (7) any local interest in the controversy; and (8) the relative court congestion and time of trial in each forum.

*Holliday*, 2010 WL 3910143, at *6 (citing *Williams v. Bowman*, 157 F. Supp. 2d 1103, 1106 (N.D. Cal. 2001)).

Because "environmental cases are typically resolved by the court examining the administrative record to decide cross-motions for summary judgment," however, many of these factors are not implicated.  *Ctr. for Biological Diversity v. Kempthorne*, No. C 07 0894 EDL, 2007 WL 2023515, at *5 (N.D. Cal. July 12, 2007).  Instead, "in most environmental cases, the issue of which federal district should adjudicate the issues is determined by weighing a plaintiff's choice of forum against the competing interest in 'having localized controversies decided at home.'"  *Id.* (quoting *Piper Aircraft Co. v. Reyno*, 454 U.S. 235, 241 n.6 (1981)).

As explained below, this suit should be transferred to the Eastern District of Louisiana because Plaintiffs' choice of forum is entitled to minimal deference, while the Eastern District of Louisiana has a considerable interest in resolving controversies regarding deepwater drilling techniques and equipment used only in the Gulf of Mexico OCS.

> 1.  Plaintiffs' Choice of Forum is Entitled to Minimal Deference.

Although courts typically afford "substantial weight" to a plaintiff's choice of forum, less deference is due "where the forum lacks a significant connection to the activities alleged in the complaint." *Williams*, 157 F. Supp. 2d at 1106 (quoting *Fabus Corp. v. Asiana Express Corp.*, No. C-00-3172 PJH, 2001 WL 253185, at *1 (N.D. Cal. Mar. 5, 2001)).  This "substantially reduced" deference applies "*even if* the plaintiff is a resident of the forum." *Chesapeake*

1    *Climate*, 2013 WL 6057824, at *2; *see also Knapp v. Wachovia Corp.*, No. C 07-4551 SI, 2008

2    WL 2037611, at *2 (N.D. Cal. May 12, 2008) ("[W]here the transactions giving rise to the action

3    lack a significant connection to the plaintiff's chosen forum, the plaintiff's choice of forum is

4    given considerably less weight, even if the plaintiff is a resident of the forum.").

5        Because this District lacks a significant connection to the Revised Well Control Rule,

6    Plaintiffs' choice of forum is entitled to only minimal deference.  Plaintiffs do not and cannot

7    allege that any part of the rulemaking process, let alone a substantial part, occurred in the

8    Northern District of California.  *Cf.* Brink Decl. ¶ 10.  Nor can Plaintiffs allege that this District

9    has a particular interest in the effects of the Revised Well Control Rule, as there are no active

10   OCS leases off this District's coast.  *See supra* Part II.A.  Indeed, the sole reason that venue is

11   permissible in this District is that Sierra Club—just one of eight Plaintiffs—resides here.  *See* 28

12   U.S.C. § 1391(c)(2).

13       But courts in this District have repeatedly held—often in cases involving Sierra Club—

14   that a single plaintiff's residence is insufficient to preserve venue if the District has no

15   connection to the subject matter of the litigation.[7]  In *Chesapeake Climate*, for example, Judge

16

17   [7] *See, e.g.*, *Chesapeake Climate*, 2013 WL 6057824, at *2 (Alsup, J.) (declining to defer to Sierra
18   Club's chosen forum because "none of the operative facts arose in this district"); *Alec L. v.
     Jackson*, No. C-11-2203 EMC, 2011 WL 8583134, at *3 (N.D. Cal. Dec. 6, 2011) (Chen, J.)
19   (transferring to District of Columbia despite the residence of two plaintiffs in this District, "as
     the operative facts did not occur in the Northern District"); *Ctr. for Food Safety v. Vilsack*, No. C
20   11-00831 JSW, 2011 WL 996343, at *6 (N.D. Cal. Mar. 17, 2011) (White, J.) (transferring to
     District of Columbia despite Sierra Club's residence, because the challenged decision did not
21   affect the District); *Sierra Club v. U.S. Def. Energy Support Ctr.*, No. C 10-02673 JSW, 2011
     WL 89644, at *2 (N.D. Cal. Jan. 11, 2011) (White, J.) (transferring to Eastern District of
22   Virginia despite Sierra Club's residence, because "the underlying action is not connected to the
     Northern District of California"); *Sierra Club v. U.S. Dep't of State*, No. C 09-04086 SI, 2009
23   WL 3112102, at *3 (N.D. Cal. Sept. 23, 2009) (hereinafter *Sierra Club II*) (Illston, J.)
     (transferring to District of Minnesota because "[n]one of the operative facts occurred in this
24   district, and . . . this district has little interest in the parties or subject matter, other than the single
     plaintiff (Sierra Club) whose headquarters are located in San Francisco"); *Ctr. for Biological
25   Diversity v. Rural Utils. Serv.*, No. C-08-1240 MMC, 2008 WL 2622868, at *1 (N.D. Cal. June
     27, 2008) (Chesney, J.) (transferring to Eastern District of Kentucky, despite Sierra Club's
26   residence, "because no part of their claims arose in the instant district"); *Ctr. for Biological
     Diversity*, 2007 WL 2023515, at *1, 6 (Laporte, J.) (transferring case to District of Alaska even
27   though a plaintiff maintained its "organizational headquarters in San Francisco," because the
28

1   Alsup declined to defer to Sierra Club's chosen forum because "the Northern District does not

2   have a particular interest in the subject matter of this action as none of the environmental impacts

3   alleged in the complaint occurred in this district."  2013 WL 6057824, at *2.  Similarly, in *Sierra*

4   *Club II*, Judge Illston transferred the case to the District of Minnesota because "[n]one of the

5   operative facts occurred in this district" and "this district has little interest in the parties or

6   subject matter, other than the single plaintiff (Sierra Club) whose headquarters are located in San

7   Francisco."  2009 WL 3112102, at *3.

8       The residences of the seven other Plaintiffs underscore the minimal connection between

9   this lawsuit and the Northern District of California.  Aside from Sierra Club, the other Plaintiffs

10  reside in Louisiana, North Carolina, South Carolina, New York, Arizona, and the District of

11  Columbia.  *See supra* Part II.C.  Because only one of eight Plaintiffs resides in this District, the

12  deference due to their chosen forum is significantly decreased.  *See Chesapeake Climate*, 2013

13  WL 6057824, at *2 (declining to defer to plaintiffs' chosen forum because "only two of the six

14  plaintiffs are headquartered in this district"); *Alec L.*, 2011 WL 8583134, at *3 (similarly

15  declining deference when "Plaintiffs' only connection to the Northern District is that two of the

16  five individual Plaintiffs reside" here); *Sierra Club II*, 2009 WL 3112102, at *3 (similarly

17  declining deference where "three out of four plaintiff organizations are located outside of

18  California").  This is not a case "[w]here there are only two parties to a dispute" and thus "good

19  reason why it should be tried in the plaintiff's home forum if that has been his choice."  *Koster v.*

20  *(Am.) Lumbermens Mut. Cas. Co.*, 330 U.S. 518, 524 (1947).  Instead, with numerous plaintiffs,[8]

21  "all of whom could with equal show of right go into their many home courts, the claim of any

22  one plaintiff that a forum is appropriate merely because it is his home forum is considerably

23  weakened."  *Koster*, 330 U.S. at 524.

24  ──────────────

25  "case, at its core, involves the environmental impact of oil and gas industry activities in the
    Beaufort Sea and adjacent coast of Northern Alaska").

26

27  [8] While Plaintiffs are organizations, they bring this case on behalf of themselves and as
    "representative[s]" of their thousands of members.  *See* Am. Compl. ¶¶ 19–26.  "[I]n

28  representative actions, where the plaintiff seeks to vindicate rights of others the plaintiff's venue
    preference is weakened."  Wright & Miller, 15 Fed. Prac. & Proc. Juris. § 3848 (4th ed.).

1    Faced with a "considerably weakened" claim for deference to their chosen forum, *see id.*,

2    Plaintiffs attempt to establish a local interest in the subject of their lawsuit by pointing to a *draft*

3    proposal for a national OCS leasing program, which contemplates the possibility of offering

4    leases for sale throughout the entire OCS, including along this District's coast.  *See* Am. Compl.

5    ¶ 84.  But that draft proposal is insufficient even to provide Plaintiffs with standing, let alone to

6    support venue in this District, as explained below.

7    The draft proposal is just "the first in a series of three preliminary proposals made by the

8    Secretary" of the Interior "before he may take final action."  Ex. B, Draft Proposed Program, at

9    3.  And it was drafted broadly to include "at this stage nearly the entire OCS," *id.* at 1, in order to

10   provide "maximum flexibility so that areas considered for leasing may be narrowed at later

11   stages . . . after further environmental analysis and important input and coordination with key

12   stakeholders," *id.* at 2.  Thus, "it is entirely speculative whether" lease sales along Northern

13   California "will be part of the final" action the Secretary ultimately takes.  *Ly-Luck Rest. v. U.S.*

14   *Dep't of Labor*, No. C-92-3852 SBA, 1993 WL 121780, at *1 (N.D. Cal. Apr. 1, 1993)

15   (declining to draw conclusions about what a final rule might say based on a proposed rule).

16   Given the preliminary nature of that draft proposal, Plaintiffs' suggestion that the

17   proposal will eventually result in OCS activities off this District's coast is too speculative even to

18   support standing.  To establish standing, an alleged future injury must be "*certainly impending*";

19   "'[a]llegations of *possible* future injury' are not sufficient." *Clapper v. Amnesty Int'l USA*, 568

20   U.S. 398, 409 (2013) (quoting *Whitmore v. Arkansas*, 495 U.S. 149, 158 (1990), emphasis in

21   *Clapper*).  Because the draft proposal is preliminary and subject to potential narrowing, Plaintiffs

22   cannot use that preliminary proposal to manufacture an injury in fact in this District.  *See*

23   *Clapper* at 402 (plaintiffs "cannot manufacture standing . . . based on hypothetical future harm

24   that is not certainly impending").

25   Nor can Plaintiffs' speculation about future lease sales off this District's coast preserve

26   venue here.  "[T]he state of the facts at the time the complaint was filed are the operative facts

27   for determining venue." *Da Cruz v. Princess Cruise Lines, Inc.*, No. C-00-0867 TEH, 2000 WL

28   1585695, at *3 (N.D. Cal. Oct. 12, 2000) (declining to resolve venue dispute based on

1    speculation about what might happen in this District).  Because venue is determined at the time

2    the complaint was filed, courts reject speculation about what might happen as the litigation

3    unfolds.  *See Heredia v. Sunrise Senior Living LLC*, No. 18-cv-00616-HSG, 2018 WL 5734617,

4    at *5 (N.D. Cal. Oct. 31, 2018) (rejecting the "speculative argument by Plaintiff" about how

5    many putative class members would provide testimony when resolving transfer motion).

6         Even if the draft proposal were final action, this District's interest in the litigation would

7    still be too remote to merit deference to Plaintiffs' chosen forum.  By including "nearly the entire

8    OCS" in leasing proposals, Ex. B, Draft Proposed Program, at 1, the draft proposal—if final—

9    would give every coastal district a similar, minimal stake in the Revised Well Control Rule.  But

10   such a generalized interest is insufficient to provide this District with the necessary "particular

11   interest" in this litigation.  *See Alec L.*, 2011 WL 8583134, at *3; *Sierra Club II*, 2009 WL

12   3112102, at * 3.  For example, in *Sierra Club II*, plaintiffs alleged that this District had an

13   interest in a Minnesota pipeline because "they were particularly concerned about the effects the

14   pipeline's greenhouse gas emissions will have on the climate of California."  2009 WL 3112102,

15   at *4.  Judge Illston rejected that argument, explaining that "global warming is only one of the

16   potential environmental effects of this project, and one that is somewhat removed in time,"

17   whereas "other impacts, including environmental, aesthetic, and economic, will be felt by

18   Minnesotans immediately."  *Id.*  So too here.  Even were the draft proposal final, any interest this

19   District might have would be far removed because "[d]evelopment of OCS oil and gas is a long-

20   term endeavor," in which "newly available OCS areas" likely will not produce "for a decade or

21   more."  Ex. B, Draft Proposed Program, at 1.[9]  In contrast, the Gulf of Mexico region has an

22   immediate interest in the Revised Well Control Rule, as it has nearly 2,500 active leases

23   producing 98% of the nation's OCS oil and gas.  *See supra* Part II.A.

24

25

26   _____

27   [9] The Draft Proposed Program notes that OCS development off California faces an additional
     hurdle: "California refineries are already running at capacity," meaning that the West Coast
     region "would need additional refinery capacity to allow the region to use" its OCS oil and gas.
28   Ex. B, Draft Proposed Program, at 6-14; *see also id.* at 6-7, 6-8.

2.   <u>The Local Interest in the Controversy Supports Transfer to the Eastern District of Louisiana.</u>

The factor that is "arguably the most important" under Section 1404(a) is the interest in deciding local controversies at home. *S. Utah Wilderness v. Norton*, No. Civ.A. 01-2518(CKK), 2002 WL 32617198, at *5 (D.D.C. June 28, 2002); *see also Bay.org v. Zinke*, No. 17-CV-03739-YGR, 2017 WL 3727467, at *1 (N.D. Cal. Aug. 30, 2017) ("any local interest in the controversy" is one of the "most important factors" to consider in venue transfers "in environmental cases brought pursuant to the APA") (citations omitted).  As the Supreme Court has stated,

> In cases which touch the affairs of many persons, there is reason for holding the trial in their view and reach rather than in remote parts of the country where they can learn of it by report only.  *There is a local interest in having localized controversies decided at home.*

*Gulf Oil Corp. v. Gilbert*, 330 U.S. 501, 509 (1947) (emphasis added).  Such concerns are especially relevant in environmental cases, which "often provide a particularly strong basis for finding a localized interest in the region touched by the challenged action."  *Sierra Club II*, 2009 WL 3112102, at *3.  Here, that factor weighs decisively in favor of transfer.

The Gulf of Mexico is the region most directly affected by the challenged action for four reasons.  *First*, Plaintiffs' suit focuses on revisions to regulations that apply to deepwater drilling techniques and equipment used on the OCS only in the Gulf of Mexico.  *See supra* Part II.D.  The Gulf of Mexico is therefore the only region with a significant interest in the challenged revisions to deepwater drilling equipment and techniques, such as those governing subsea BOPs, BOPs on floating facilities, containment equipment, real-time monitoring standards, Mechanical Integrity Assessment Reports and API Bulletin 92L.  *See id.*

*Second*, as to the challenged regulations that also affect shallow-water drilling, the Gulf of Mexico region will be most directly affected because it has the vast majority of OCS oil and gas activity.  It produces 98% of the nation's OCS oil and gas.  *See supra* Part II.A.  And it has nearly 2,500 active leases, compared to just 54 for Alaska, 34 for Southern California, and 0 for Northern California.  *See id.*  The volume of judicial opinions from the relevant districts also

demonstrate the Gulf's significantly greater interest in this action; for example, whereas Gulf-adjacent districts have issued dozens of opinions discussing BOPs, this District has issued none.[10] Thus, the Gulf of Mexico region has the greatest stake in any challenge to the Revised Well Control Rule.

*Third,* the Gulf of Mexico also has the greatest interest in the economic and safety impacts of the Revised Well Control Rule. Plaintiffs allege that this rule "put[s] workers' lives . . . at substantial risk." Am. Compl. ¶ 13. Because seventy percent of jobs sustained by OCS oil and gas activities go to Gulf state residents, with sixteen percent of those jobs going to Louisiana residents, *supra* Part II.A, Plaintiffs' challenge should be heard in the Gulf region so that affected workers can attend hearings. *See Gulf Oil*, 330 U.S. at 509 ("In cases which touch the affairs of many persons, there is reason for holding the trial in their view and reach rather than in remote parts of the country where they can learn of it by report only."). The importance of OCS activity to the Gulf economy also supports transfer to the Eastern District of Louisiana. *Sierra Club II*, 2009 WL 3112102, at *4 (transferring to Minnesota given the "significant economic implications" of the challenged activity in Minnesota); *Ctr. for Biological Diversity*, 2007 WL 2023515, at *6 (transferring action to Alaska where "the challenged . . . decision authorizing the 'incidental take' of polar bears and Pacific walrus as part of industrial oil and gas exploration, development and production activities in Alaska is one in which Alaska and its residents have a great interest.").

*Fourth,* the challenged administrative process substantially occurred in BSEE's Gulf of Mexico Region office in New Orleans, Louisiana. Because both the proposed and final rules were primarily drafted in the Eastern District of Louisiana, Brink Decl. ¶ 9, that district has a local interest in the controversy. *See, e.g.*, *Chesapeake Climate*, 2013 WL 6057824, at *3 (transferring to district where "the administrative process occurred"); *Ctr. for Food Safety*, 2011

---

[10] A search of Westlaw's All Federal database for the term "blowout preventer" yields the following results: 42 opinions from the Eastern District of Louisiana; 40 opinions from the Southern District of Texas; 9 opinions from the Western District of Louisiana; and 0 opinions from the Northern District of California.

WL 996343, at *7 (same); *see also Gerin  v. Aegon USA, Inc.*, No. 06-5407, 2007 WL 1033472 SBA, at *6 (N.D. Cal. Apr. 4, 2007) (granting motion to transfer to the Middle District of Florida where "the prospectuses and marketing materials about which Plaintiffs complain, and which are the centerpiece of this litigation, were drafted, reviewed, edited and approved in Florida, and thus the operative facts on which the complaint is based transpired in Florida").

In contrast to the strong interests of the Eastern District of Louisiana in the challenged rule, the Northern District of California has no particular interest in that rule.  The Amended Complaint alleges no impacts that are occurring in this District.[11]  And any interest this District may have is heavily outweighed by the interest the Eastern District of Louisiana has in the challenged rule, as seen by comparing the active OCS leases off each district's coast:

 

Eastern District of Louisiana                    Northern District of California

---

[11] Aside from the speculative suggestion that the draft proposal makes it "reasonably foreseeable" that OCS oil and gas development will occur off this District's coast, Am. Compl. ¶ 172, the Amended Complaint also alleges no impacts that *will* occur in this District.

Thus, the local interest factor supports transfer of venue to the Eastern District of Louisiana. *See, e.g.*, *Chesapeake Climate*, 2013 WL 6057824, at \*3 (finding that the factors "strongly favor transfer," where "the Northern District does not have a particular interest in the subject matter of the litigation" and the transferee district is nearer to the alleged environmental impacts); *Sierra Club II*, 2009 WL 3112102, at \*3–4 ("Minnesota's localized interest in deciding the case weighs strongly in favor of transfer" because "[n]one of the operative facts occurred in this district, and . . . this district has little interest in the parties or subject matter, other than the single plaintiff (Sierra Club) whose headquarters are located in San Francisco").

### 3. The Remaining Factors Either Favor Transfer to the Eastern District of Louisiana or Are Neutral.

As discussed *supra*, the remaining venue factors are "for the most part not implicated" in administrative cases, like this one, that "are typically resolved by the court examining the administrative record to decide cross-motions for summary judgment." *Ctr. for Biological Diversity*, 2007 WL 2023515, at \*5. These factors are nonetheless briefly discussed below.

The convenience factors—convenience of the parties and witnesses, and ease of access to sources of proof—support transfer to the Eastern District of Louisiana. As to convenience of the parties, the Eastern District of Louisiana is more convenient for the BSEE officials located in New Orleans, Louisiana who were involved in drafting the rule. It would be wasteful and inefficient to force these government officials to travel to San Francisco in order to prepare for or attend hearings, conferences, or mediation in this case.

The Eastern District of Louisiana will also be equally or more convenient than this District for the Plaintiffs.[12] Plaintiff Healthy Gulf is based in New Orleans, Louisiana and frequently brings suits as a plaintiff in that forum. Ex. L (showing Healthy Gulf, f/k/a Gulf

---

[12] The convenience of counsel is not a proper factor for the Court to consider in determining which venue is the most appropriate. *See Ctr. for Biological Diversity*, 2008 WL 2622868, at \*1 (holding that "the convenience of counsel is not a recognized factor" to be considered). Nonetheless, to the extent it is considered, only one of five Plaintiffs' attorneys is based in this District. *See* Am. Compl., at 1. Two of Plaintiffs' attorneys are based in locations (Texas and South Carolina) that are closer to New Orleans than San Francisco.

Restoration Network, has filed 14 suits in E.D. La.).  New Orleans is also much closer than San

Francisco to Plaintiffs North Carolina Coastal Federation and South Carolina Coastal

Conservation League.  While Plaintiff Sierra Club's headquarters is in this District, it is a

"national organization with offices throughout the country," *Sierra Club II*, 2009 WL 3112102,

at *4, including a regional office in New Orleans, as well as a Louisiana chapter with over 3,200

members.[13]  Plaintiff Sierra Club has often litigated, as a plaintiff, in the Eastern District of

Louisiana, demonstrating that it is not an inconvenient forum.  Ex. M (showing Sierra Club has

appeared as plaintiff in 11 suits in E.D. La.)  Similarly, Plaintiffs Natural Resources Defense

Council, Center for Biological Diversity, and Defenders of Wildlife have brought suit as

plaintiffs in the Eastern District of Louisiana.  Exs. N, O, P.  Because the Eastern District of

Louisiana will be more convenient for some Plaintiffs and all Defendants, this factor weighs in

favor of transfer.

The witness convenience factor also weighs in favor of transfer to the Eastern District of

Louisiana.  Because this APA case is appropriately resolved on cross-motions for summary

judgment based on the administrative record, disposition of the merits will not turn on the

testimony of witnesses or require access to any sources of proof.  *Ctr. for Biological Diversity*,

2007 WL 2023515, at *5.  To the extent that witness attendance at court proceedings becomes

necessary, those witnesses would likely be the government officials involved in the rulemaking

that are located in the Eastern District of Louisiana and the District of Columbia.  *See Sierra

Club*, 2011 WL 89644, at * 2 (transferring action to Eastern District of Virginia where any

evidence required at remedies phase was located).  In balancing the statutory factors to decide a

transfer motion, courts accord more weight to the convenience of any non-party witnesses than

that of the parties.  *Saleh v. Titan Corp.*, 361 F. Supp. 2d 1152, 1160 (S.D. Cal. 2005) ("the

convenience of non-party witnesses is the more important factor") (citation omitted).  Should the

interests of third parties become relevant as an equitable factor, those third parties are most likely

to be located in the Gulf of Mexico region (given the distribution of OCS activity), which is

---

[13] https://www.sierraclub.org/louisiana/about-delta-chapter.

therefore a more convenient forum.  This too weighs in favor of transfer.  *See Sierra Club II*, 2009 WL 3112102, at *4 ("[A]lthough the Court notes that both parties have stated they do not anticipate a need for discovery, Minnesota will be a more convenient forum for witnesses in the event any depositions or testimony are required.").

Should access to any sources of proof become necessary, any such evidence would most likely be in the Eastern District of Louisiana or the District of Columbia, where the administrative processes principally occurred.  Thus, to the extent that the ease of access to sources of proof factor is relevant, it weighs in favor of transfer to the Eastern District of Louisiana.

The administrative factors—the respective familiarity of the courts with applicable law, the feasibility of consolidation, and the relative congestion of the transferor and transferee courts—are neutral.  Because this case involves questions of federal law, this District and the Eastern District of Louisiana are equally familiar with the law that applies.  *See Allstar Mktg. Grp., LLC v. Your Store Online, LLC.*, 666 F. Supp. 2d 1109, 1133 (C.D. Cal. 2009).  Thus, that factor is neutral.

At present, Defendants are unaware of any cases pending in this District or the Eastern District of Louisiana that may be appropriate for consolidation with this case.  Thus, this factor is neutral.

Finally, the relative congestion of the two fora is neutral and less important than the other factors.  *Animal Legal Def. Fund v. U.S. Dep't of Agric.*, No. CV 12-4407-SC, 2013 WL 120185, at *6 (N.D. Cal. Jan. 8, 2013) (noting this factor is "not as weighty as the other factors").  "To measure congestion, courts compare the two fora's 'median time from filing to disposition or trial.'"  *Ctr. for Food Safety*, 2011 WL 996343, at *8 (quoting *Costco Wholesale Corp. v. Liberty Mut. Ins. Co.*, 472 F. Supp. 2d 1183, 1196 (S.D. Cal. 2007)).  For civil cases over the last six years, the Eastern District of Louisiana's median time to disposition ranged from 4.5 to 11

months and median time to trial ranged from 15.6 to 21.3 months.[14]  In the same context, this

District's median time to disposition ranged from 7.0 to 8.5 months and median time to trial

ranged from 24.6 to 31.6 months.  *Id.*  The average median time to disposition over the last six

years in civil cases is virtually identical: 7.6 months for the Eastern District of Louisiana and 7.7

months for this District.  *See id.*  Because there is no "major difference in the relative congestion

of the court calendars," this factor is neutral.[15]  *Ctr. for Biological Diversity*, 2007 WL 2023515,

at *5.

In sum, this case should be transferred to the Eastern District of Louisiana because that

District's substantial interest in the subject of this case significantly outweighs this District's

minimal interest based on the residence of one of many Plaintiffs.  The remaining factors, while

less important, also weigh in favor of transfer or are neutral.

---

[14] Federal Court Management Statistics, U.S. District Courts (June 30, 2019),
https://www.uscourts.gov/statistics/table/na/federal-court-management-statistics/2019/06/30-1.

[15] Some courts have also analyzed congestion by comparing the average number of pending
cases per judgeship.  *See, e.g.*, *Chesapeake Climate*, 2013 WL 6057824, at *3 (giving this factor
no weight where it was "hard to account for [the] anomaly" in which one district had "more than
twice as many pending cases" per judge as another district).  Here, such a comparison would be
"misleading in terms of court congestion because there are several multidistrict litigation
('MDL') matters pending" in the Eastern District of Louisiana, *Mater of Stokes*, No. 16-14645,
2016 WL 7012301, at *4 (E.D. La. Dec. 1, 2016), that distort the statistics by accounting for *over
eighty-five percent (85%)* of all actions pending in that District, *see* Ex. J, MDL Statistics Report
– Distribution of Pending MDL Dockets by Actions Pending (July 16, 2019) (indicating that
three of the ten largest MDLs in the country are pending before three judges in the Eastern
District of Louisiana, who collectively have 43,909 MDL cases before them).  Because MDL
actions involve "common questions of fact" and are subject to "coordinated or consolidated
pretrial proceedings," 28 U.S.C. § 1407(a), they tend to "require far less work per case than
many other cases do."  *Ramirez v. Prof'l Transp., Inc.*, No. 16-CV-1340-JPG-RJD, 2017 WL
1836625, at *3 (S.D. Ill. May 8, 2017) ("More cases do not necessarily mean a slower docket.").
In terms of non-MDL cases, this District and the Eastern District of Louisiana are quite close in
the number of actions pending per judgeship.  *See* Ex. K (indicating that there are 449 non-MDL
cases per judgeship in this District, while there are 492 such cases per judgeship in the Eastern
District of Louisiana).  Moreover, were it accurate to include MDL cases in such a comparison,
this Court's number of cases would be substantially higher than the average in the Northern
District of California (750 cases) because it has 955 pending actions just from MDL-2691, *In re*:
*Viagra (Sildenafil Citrate) & Cialis (Tadalafil) Products Liability Litigation*.  *See* Ex. J at 1.

### C. Alternatively, the Section 1404(a) Factors Support Transferring This Action to the District of Columbia.

While the most appropriate transferee forum is the Eastern District of Louisiana, given the Gulf of Mexico's substantial interest in the Revised Well Control Rule, Defendants alternatively move to transfer to the District of Columbia. As explained below, the transfer factors favor transfer to the District of Columbia because it has a greater local interest in this case, as the administrative and decision-making processes occurred there, and because it is more convenient to the parties, including most Plaintiffs.

As explained above, the Plaintiffs' choice of forum is entitled to minimal deference because this District has no interest in the litigation except for Sierra Club's residence (as just one of eight Plaintiffs). *See supra* Part III.B.1. The remaining factors weigh in favor of transfer to the District of Columbia or are neutral, as explained below.

1.  The Local Interest in the Controversy Favors Transfer to the District of Columbia.

While this District has no interest in the subject matter of this litigation, the District of Columbia has a significant interest in this litigation because much of the administrative process occurred in the Washington, D.C. area, where Defendants reside. After the proposed and final rules were primarily drafted in New Orleans, they were "substantively reviewed and revised by a number of BSEE and Department of the Interior officials" in the District of Columbia, before ultimately being approved by the Department's Assistant Secretary for Land and Minerals Management, who is located in Washington, D.C. Brink Decl. ¶ 9. Additionally, the environmental analysis and regulatory impact analysis were completed in the Washington, D.C. area. *Id.* In similar circumstances, courts in this District have concluded that "the District of Columbia likely has a greater interest in [the] controversy than California, and thus this factor weighs in favor of transfer." *Alec L.*, 2011 WL 8583134, at *5; *see also Ctr. for Food Safety*, 2011 WL 996343, at *7 (because federal agency's "administrative process" occurred in the District of Columbia and federal defendants reside there, "the District of Columbia has a stronger local interest" than the Northern District of California in adjudicating challenge to agency actions).

2.   <u>The Convenience Factors Also Support Transfer to the District of Columbia.</u>

The convenience factors also support transfer to the District of Columbia.  As to convenience of the parties, the District of Columbia is more convenient for the BSEE and Interior officials located there.  It is also more convenient than San Francisco for the New Orleans-based BSEE officials, who occasionally travel to Washington, D.C., as part of their usual duties.

The District of Columbia will also be more convenient than this District for the Plaintiffs. While only one Plaintiff resides in this District, two Plaintiffs (Defenders of Wildlife and Friends of the Earth) reside in Washington, D.C.  *See supra* Part II.C.  Two other Plaintiffs (North Carolina Coastal Federation and South Carolina Coastal Conservation League) are based on the East Coast and thus much closer to the District of Columbia than to this District.  Plaintiff Healthy Gulf is closer to Washington, D.C. than San Francisco.  And the three remaining Plaintiffs (Sierra Club, National Resources Defense Council, and Center for Biological Diversity) have offices in Washington, D.C.[16]  Because Washington, D.C. is more convenient for most of the Plaintiffs and all of the Defendants, this factor tilts heavily towards transfer to the District of Columbia.  *See Alec L.*, 2011 WL 8583134, at *3 (when "the majority of Plaintiffs and Defendants reside in or near or have connections to the District of Columbia," the convenience of the parties "weighs in favor of transfer" to the District of Columbia).

The convenience of the District of Columbia for Plaintiffs is evidenced by their frequent decision to select that forum as plaintiffs.  *See* Ex. Q (Sierra Club is a plaintiff in 222 cases in the District of Columbia); Ex. R (Center for Biological Diversity is a plaintiff in 113 such cases); Ex. S (Defenders of Wildlife is a plaintiff in 76 such cases); Ex. T (Natural Resources Defense Council is a plaintiff in 39 such cases); Ex. U (Friends of the Earth is a plaintiff in 34 such cases); Exs. V, W (Healthy Gulf is a plaintiff in 8 such cases); Ex. X (South Carolina Coastal Conservation League is a plaintiff in 2 such cases).

---

[16] Ex. G; Ex. I; https://www.sierraclub.org/contact-us (last accessed __).

The remaining convenience factors—convenience of witnesses and access to sources of proof—are less important in this APA case that will be reviewed based on an administrative record.  But those factors also favor transfer because any potential witnesses and sources of proof are located where the administrative process occurred—the District of Columbia and the Eastern District of Louisiana.  *See supra* Part III.B.3.

        3.   <u>The Administrative Factors Favor Transfer to the District of Columbia or are Neutral.</u>

Finally, the administrative factors either favor transfer or are neutral.  The first two factors (the respective familiarity of the courts with the applicable law and the feasibility of consolidation) are neutral as explained above.  *See id.*

The relative congestion of the transferor and transferee courts, however, slightly favor transfer to the District of Columbia.  For civil cases over the last six years, the District of Columbia's median time to disposition ranged from 5.6 to 8.2 months and median time to trial ranged from 39.8 to 48.7 months.[17]  In the same context, this District's median time to disposition ranged from 7.0 to 8.5 months and median time to trial ranged from 24.6 to 31.6 months.  *Id.*  The average median time to disposition over the last six years in civil cases is similar: 7 months for the District of Columbia and 7.7 months for this District.  *See id.*  There are, however, two reasons why this factor slightly favors the District of Columbia.

*First*, the District of Columbia's median time to trial has been steadily decreasing from 8.2 months, to 8.0 months, to 6.9 months, to 6.0 months, to 5.6 months, from 2015 to 2019, with the appointment of four judges during that time.  *Id.*  Given the new judicial appointments, this lower time to disposition can be expected to continue, whereas this District has received no new judicial appointments since 2014.

*Second*, the District of Columbia has fewer pending cases per judgeship than this District, even when excluding MDL cases.  The District of Columbia has just 339 <u>total</u> cases pending per judge, *see id.*, whereas this District has 449 <u>non-MDL</u> cases pending per judge and 750 <u>total</u>

---

[17] Federal Court Management Statistics, U.S. District Courts (June 30, 2019), https://www.uscourts.gov/statistics/table/na/federal-court-management-statistics/2019/06/30-1.

1   cases pending per judge, *see id.*  Thus, the relative court congestion factor slightly favors transfer

2   to the District of Columbia.

3                                          <u>**CONCLUSION**</u>

4           For the foregoing reasons, this case should be transferred to the Eastern District of

5   Louisiana.  Alternatively, the Court should transfer this case to the District of Columbia.

6

7   Respectfully submitted this 11th day of October, 2019.

8                                          JEAN E. WILLIAMS
9                                          Deputy Assistant Attorney General
                                           Environment & Natural Resources Division
10                                         United States Department of Justice

11                                         /s/ *Michael S. Sawyer*
12                                         MICHAEL S. SAWYER (CSB No. 277766)
                                           MICHELLE-ANN C. WILLIAMS (MD Bar)
13                                         Natural Resources Section
                                           H. HUBERT YANG (DC Bar No. 491308)
14                                         Wildlife and Marine Resources Section
                                           Environment & Natural Resources Division
15                                         United States Department of Justice

16
17                                         *Attorneys for Federal Defendants*

18

19

20

21

22

23

24

25

26

27

28